IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAHYMEEN JAMEL BARBER, SR.  *
 #365-763, #245-5451

           *

 Petitioner

           *

 v.           Civil Action No. DKC-17-2491

           *

RICKEY FOXWELL, and
THE ATTORNEY GENERAL OF THE *
STATE OF MARYLAND

           *

 Respondents

           *

**MEMORANDUM OPINION**

Petitioner Rahymeen Jamel Barber, Sr., challenges his convictions for sexual abuse of a minor, second degree rape, and other offenses in this petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Respondents assert the petition should be denied and dismissed. (ECF No. 4).  Mr. Barber has not filed a reply.

The issues have been briefed and there is no need for an evidentiary hearing.  *See* Rule 8(a), Rules Governing Section 2254 cases in the United States District Courts; Local Rule 105.6 (D. Md. 2018); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (stating a petitioner is not entitled to hearing under 28 U.S.C. § 2254(e)(2)).  For the reasons set forth below, the court will deny and dismiss the petition with prejudice.

**PROCEDURAL HISTORY**

Mr. Barber was convicted after a jury trial in the Circuit Court for Wicomico County of sexually abusing his minor stepdaughter.  ECF No. 4-3 pp.42-43.  He was sentenced to a total of fifty years of incarceration on October 22, 2010.  ECF No. 4-1 pp. 11-14.

## I.      Direct Appeal

Mr. Barber appealed his conviction to the Court of Special Appeals of Maryland, presenting one question:  "Whether the trial court erred in allowing other 'bad acts' into evidence and/or erred in denying the motion for mistrial?"  *See Rahymeen J. Barber v. State of Maryland*, No. 2238, Sept. Term, 2010 (filed June 13, 2012) at ECF No. 4-4.  The Court of Special Appeals affirmed his convictions.  *Id.*  On September 24, 2012, the Court of Appeals of Maryland denied Mr. Barber's petition for a writ of certiorari.  *Barber v State*, 428 Md. 544 (2012).

## II.     Post-Conviction Proceedings

### A.      Petition for Post-Conviction Relief

Mr. Barber, then self-represented, had earlier filed a petition for post-conviction relief in the Circuit Court for Wicomico County, Maryland on July 27, 2012, which was later supplemented by his counsel on June 5, 2013, presenting the following claims of ineffective assistance of trial counsel:

> I.      Counsel was ineffective for failure to investigate the State's medical expert testimony and violated Mr. Barber's right to due process by failing to offer a viable defense.
>
>> A.      Counsel provided ineffective assistance in failing to investigate the State's medical expert testimony that was central to the jury's credibility assessment of the victim.[1]
>>
>> B.      The admission of inaccurate and misleading scientific evidence violates the due process clause.
>
> II.      Counsel rendered ineffective assistance for failure to object to the victim's inadmissible prior inconsistent statements; for failure to object when the State made rehabilitative remarks during their opening statement; and failure to request a limiting instruction.

---

[1]     Portions of the state record refer to the victim by her full name or first name and first initial of her last name and are unredacted.  In light of the sensitive nature of the issues and to protect personal information about the victim, Respondents' exhibits docketed at ECF Nos. 4-1, 4-2, 4-3, 4-4, 4-5, 4-6, 4-7, 4-8 will be placed under seal.

A.      Counsel rendered ineffective assistance for failure to object to out of court statements made by the victim to others under Maryland Rule 5-802.1.

B.      Counsel rendered ineffective assistance for failure to object when the State made rehabilitative remarks in their opening statement and failed to challenge the admissibility of prior out-of-court statements under Md Rule 5-616(c)(2).

C.      Counsel rendered ineffective assistance for failure to request a limiting instruction that prior inconsistent statements offered by the social workers, the doctor, and the mother were not intended for their truth that the abuse actually occurred.

III.    Defense counsel rendered ineffective assistance for failure to object to a witness commenting on the truthfulness of the victim.

IV.     Defense counsel rendered ineffective assistance for failing to object to the State's presentation of expert testimony about delayed reporting and accommodation in child sexual abuse cases.

V.      Defense counsel rendered ineffective assistance for failure to file a motion for reconsideration of sentence.

VI.     Defense counsel rendered ineffective assistance for failure to file an application for review of sentence by a three-judge panel.

ECF No. 4-5 pp. 17-18; ECF No. 4-7 p. 3.

The Circuit Court held a hearing on the post-conviction petition on September 12, 2013. ECF No. 4-6.  The Circuit Court granted Mr. Barber leave to file a motion for modification of sentence and an application for review of sentence by a three judge panel, but denied relief as to all other claims on November 8, 2013.  ECF No. 4-7 p. 19.

**B.      Application for Leave to Appeal Denial of Post-Conviction Relief**

Mr. Barber filed an application for leave to appeal the denial of post-conviction relief which presented two arguments:  (1) the "post-conviction court erred when it ruled trial counsel was not ineffective for failing to object to multiple recitations of the child's accusations and vouching for

her credibility" and (2) the "post-conviction court erred when it ruled that trial counsel was not ineffective for failing to challenge an inaccurate report of possible child sexual abuse, but rather reasonable trial strategy."  ECF No. 4-8 pp. 6, 9 (emphasis in original).

The Court of Special Appeals granted the application for leave to appeal on September 23, 2015, with respect to one question:

> Did the post-conviction court err in concluding that defense counsel did not provide constitutionally ineffective assistance by failing to investigate and present expert testimony to counter expert testimony presented by the State that the alleged "victim's 'normal' examination was not inconsistent with possible sexual abuse?"

ECF No. 4-9.

The Court of Special Appeals affirmed the denial of post-conviction relief by reported opinion on February 2, 2017, and on May 22, 2017, the Court of Appeals of Maryland denied his petition for a writ of certiorari.  *Barber v. State*, 231 Md. App. 490, 153 A. 3d 800, *cert. denied*, 453 Md. 10, 160 A.3d 547 (2017).

## II.    Federal Habeas Petition

Mr. Barber filed this § 2254 petition on August 29, 2017, seeking relief on the ground of ineffective assistance of trial counsel.  He claims that trial counsel rendered constitutionally ineffective assistance in violation of the Sixth Amendment: (1) by failing to investigate the State's medical expert testimony and by failing to offer a viable defense; (2) by "the admission of inaccurate and misleading scientific evidence" in violation of due process; (3) for failing to request a limiting instruction for prior inconsistent statements offered by the social workers, the doctor, and the victim's mother; (4) by failing to object when the state made rehabilitative remarks in its opening statement and to request a limiting instruction; (5) by failing to object to a witness comment about the truthfulness of the victim; (6) for failing to object to the state's presentation of

4

expert testimony and delayed reporting and accommodation in child sexual abuse cases; and (7) for failing to show Mr. Barber the video recording of the victim's interview.  ECF No. 1 pp 5-7.

Respondents argue that Mr. Barber's first six claims withstand scrutiny under 28 U.S.C. § 2254(d) and the seventh is procedurally defaulted.

## PROCEDURAL DEFAULT

Before seeking review pursuant to § 2254, a person in custody must exhaust remedies available in state court by presenting each claim to the appropriate state court.  A claim is procedurally defaulted when a petitioner has failed to present it to the highest state court with jurisdiction to hear it, and the state courts would now find that the petitioner cannot assert that claim.  *Mickens v. Taylor*, 240 F.3d 348, 356 (4th Cir. 2001) (quoting *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998)).  Procedurally defaulted claims are not subject to substantive federal habeas corpus review unless certain exceptions apply to excuse the procedural default.  Procedural default may be excused if a petitioner can demonstrate (1) both cause for the procedural default and that he will suffer prejudice if the claims are not considered on their merits; or (2) failure to consider the defaulted claim(s) would result in a miscarriage of justice, i.e. the conviction of someone who is actually innocent of the offenses.  *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Gray*, 806 F.3d at 709; *Breard v. Pruett*, 134 F.3d 615, 620 (4th Cir. 1998).

Respondents assert that Mr. Barber's ineffective assistance of counsel claim for failing to show him the recording of the victim's interview is procedurally defaulted.  ECF No. 4 p. 71.  Mr. Barber acknowledges in the petition that this claim was not presented to a state court.  ECF No. 1 p.7.  As he offers no reason why the claim was not raised in state court, nor shows cause to excuse procedural default, this claim will be denied and dismissed as procedurally defaulted.

## STANDARD OF REVIEW

The court may grant a petition for a writ of habeas corpus only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a) (providing a district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States").

The federal habeas statute sets forth a highly deferential standard for evaluating state court rulings, under which state court decisions are to "be given the benefit of the doubt."  *Bell v. Cone,* 543 U.S. 447, 455 (2005); *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997).

> A federal court reviewing a habeas petition that has already been adjudicated on the merits in state court [must] give considerable deference to the state court decision. A federal court may not grant habeas relief unless the state court arrived at a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Nicolas v. Att'y Gen. of Md.,* 820 F.3d 124, 129 (4th Cir. 2016) (quoting 28 U.S.C. § 2254(d)).  A federal habeas court "must presume that the state court's factual findings are correct unless the petitioner rebuts those facts by clear and convincing evidence," and "cannot disturb the state court's ruling simply because it is incorrect; it must also be unreasonable." *Id.*

A state adjudication is "contrary to" clearly established federal law under § 2254(d)(1) where the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor,* 529 U.S. 362, 405 (2000) *see Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005); *Barnes v. Joyner,* 751 F.3d 229, 238 (4th Cir. 2014).  A federal court "may not issue the writ simply because [the court]

concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Lovitt,* 403 F.3d at 178 (quoting *Williams,* 529 U.S. at 411). The state court's application of federal law must be unreasonable, not merely incorrect. *Id.; see Barnes*, 751 F.3d at 238–39 (state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct governing principle but unreasonably applies that principle to the facts; application of federal law must be objectively unreasonable, not merely incorrect).

Under section 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts. Further, "a determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where the state court has "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id.*

## DISCUSSION

"Deciding whether a state court's decision involved an unreasonable application of federal law or was based on an unreasonable determination of fact requires the federal habeas court to train its attention on the particular reasons—both legal and factual—why state courts rejected a

state prisoner's federal claims ... and to give appropriate deference to that decision." *Wilson v. Sellers,* 138 S. Ct. 1188, 1191–92 (2018) (internal citations and quotation marks omitted).   A federal habeas court's task under § 2254(d) is "a straightforward inquiry when the last state court to decide a prisoner's federal claims explains its decision on the merits in a reasoned opinion. *Id.*

The last reasoned decision on the merits of Mr. Barber's first claim was issued by the Court of Special Appeals in the published opinion that affirmed the post-conviction court's decision. *Barber,* 231 Md. App. at 490, 153 A. 3d at 800; ECF No. 4-13.   The Circuit Court's Statement of Reasons on post-conviction review was the last decision on the merits to consider Mr. Barber's other nonprocedurally defaulted claims.   ECF No. 4-7.

In its opinion, the Court of Special Appeals began by recounting the facts adduced at trial, on direct review, and during post-conviction proceedings relevant to the question under review. ECF Nos. 4-2; 4-3; ECF No. 4-4; ECF No. 4-13.

## I.      Trial and Direct Review

The victim, G.S., was twelve years old when she testified at trial.   G.S. testified that Mr. Barber sexually abused her during the time she was five to nine years old.   Mr. Barber was her stepfather and lived with G.S. and her family for several years in different homes in Salisbury, Maryland.   The parties stipulated that from June 10, 2003, until July 10, 2004, the family lived on Light Street; from July 11, 2004, to January 31, 2007, they lived on Mitchell Street; and from February 1, 2007, to April 20, 2009, they lived on Tilghman Street.   ECF No. 4-2 pp. 63, 65-66; ECF No. 4-4 p. 2; ECF No. 4-13 p. 3.

G.S. testified that when she was five years old and lived on Light Street, Mr. Barber called her into the living room and had her remove her pants and underwear.   He was lying on the couch wearing only a shirt and boxer shorts.   He placed G.S. on top of him and he started moving her

around.  G.S testified that she felt his "private part" on her vaginal area and testified that "when he was putting it in me, it would hurt.  It was hurting."  ECF No. 4-4 p. 3; ECF No. 4-2 pp. 67-69, 72, 75; ECF No. 4-13 p. 3.

G.S. testified about two incidents that occurred during the time the family lived on Mitchell Street.  The first was when Mr. Barber asked her to lie down in bed with him, took off her underwear and "put his private part in my private part and did the same thing over again."  ECF No. 4-2 pp. 77.  The second incident was when he put her on top of him, removed her underwear, and put his "private" part in her "private part."  *Id.* pp. 77-79.  G.S. stated her "private part" hurt. *Id.* p. 79.  G.S. said she felt something wet and noticed it was white. *Id.* 79, 80.  Her mother worked nights and was not at home at the time.  Upon further questioning, G.S. clarified the term "private parts" referred to his penis and her vagina.  *Id.* p. 79.

G.S. testified that when they lived on Tilghman Street, Mr. Barber picked her up in the kitchen and "was scooting me down by his private."  *Id.* pp. 80-81.  They were clothed at the time, but G.S. "felt his private, like kind of scoot-like sticking up."  *Id*; ECF No. 4-13 p. 4.

Jennifer Wehberg, M.D. was accepted as an expert in pediatric medicine with an emphasis on child sexual abuse.  ECF No. 4-2 pp. 115-117; ECF No. 4-13 p. 7.  Dr. Wehberg testified that when she examined G.S. on July 2, 2009,[2]  G.S. described only the initial incident that occurred on Light Street.  ECF No. 4-2 pp. 119, 121.  Dr. Wehberg testified that G.S.'s physical examination was normal, with no observed lacerations, cuts, redness, discharge, scarring, or evidence of acute trauma to the vaginal or rectal area.  *Id.* pp. 117, 119-120.

---

[2]    At the time of the interview, G.S.'s mother, Tahesha Barber, was estranged from her husband Rahymeen Barber.  ECF No. 4-5 p. 12,  n. 1.

Dr. Wehberg confirmed that G.S. told her that she had been penetrated.  *Id*. p. 120.  Dr. Wehberg opined that a "normal" finding was not inconsistent with G.S.'s report that Mr. Barber had penetrated her vagina with his penis, explaining that the "vagina is very, vascular and very elastic, and can heal very rapidly.  Often within a few days, if you have genital trauma, it can be healed to the point where you can't recognize it as trauma."  *Id*. pp. 120-121; ECF No. 4-13 p. 7.  Thus, "[a] normal genital exam can be consistent with penetrating vaginal abuse."  ECF 4-3 p. 128; ECF No. 4-13 p. 7.

On cross-examination, Dr. Wehberg was questioned further about the examination:

Q.  You examined as part of her genital examination, the presence or absence of a hymen, correct?

A.  Yes.

Q.  And you describe her hymen as crescentic?

A.  Crescentic.

Q.  Crescentic. Can you tell me what that means?

A.  A hymen is a thin membrane of tissue that covers the vaginal opening. When you're very young, your hymen is what we call, annular. It's circular in shape covering the vaginal opening. As you get more into young childhood, it becomes a crescent which is a half-moon shape. It goes over the hymen, and you can see a crescent of a thin membrane.

Q.  Okay.

A.  That hymen as you enter puberty again turns into an an[]ular hymen which is round.

Q.  The genital examination was perfectly normal, correct?

A.  Yes, it was.

Q.  There was, according to the report, no scarring, no damage, is that a fair statement?

A.  Yes, it is.

Q.  Your opinion or your diagnostic impression is that it is a normal physical exam, cannot diagnose or exclude abuse?

A.  Right.

Q.  Is that another way of saying, I don't know, maybe, maybe not?

A.  That's a way of saying, I can't tell by her physical exam whether there has been sexual abuse.

Q.  Can't confirm?

A.  Right.

ECF No. 4-2 pp. 125-127; ECF No 4-13 pp. 7-8.

On redirect examination, this exchange ensued:

A.  Are you…familiar with the research regarding medical findings in the victim substantiated child sexual abuse?

A.  Yes, I am.

Q.  What does the research say regarding a normal genital exam?

A.  A normal genital exam can be consistent with penetrating sexual abuse.

Q.  Is there a percentage of cases in which there are - sex abuse has been confirmed but it remains a normal genital exam?

A.  It has been shown that you can have a normal vaginal exam with penetrating sexual abuse.  I do not know the percentage off my head without the cited article in front of me.

ECF No. 4-2 pp. 127- 128; ECF No 4-13 pp. 8-9.

Heather Sullivan, a social worker at the Wicomico County Child Advocacy Center testified that G.S. reported five incidents of alleged sexual abuse.  ECF No. 4-2 p. 136.  When Ms. Sullivan first interviewed G.S. on May 19, 2009, and then on July 10, 2009, G.S. told her about the incident at the Light Street house.  *Id.* p. 143.  On January 28, 2010, G.S. told Ms. Sullivan that there had been more than the one incident on Light Street.  *Id.* pp. 149-50.  G.S. told her about an incident

on Mitchell Street when Mr. Barber put her on top of him and his penis came out of a hole in his underwear and his private parts touched hers. *Id.* p. 151. G.S. indicated that this incident included her performing oral sex on him. *Id*.

Ms. Sullivan testified that G.S. described another incident at the Mitchell Street address that involved penetration and ejaculation. *Id.* pp. 152, 162-63. Ms. Sullivan told the court that G.S. said Mr. Barber's penis was hard "did go inside of her," and reported seeing and feeling a white wet substance on her leg. *Id*. p. 152.

Ms. Sullivan testified that G.S. described to her a fourth incident at the Tilghman Street address when appellant had her lie on top of him on the couch and "again moved her up and down, privates touching privates, genitals touching genitals." *Id.* p. 154. A fifth incident also occurred at Tilghman Street, when appellant pulled G.S. towards him and their genitals touched through their clothing. *Id.* p. 155; ECF No. 4-13 p. 4.

Tahesha Barber, G.S.'s mother, and Mr. Barber were married from 2004 to August 2010. ECF No. 2-4 p. 179. Ms. Barber testified that G.S. first informed her in 2009 about one incident of sexual abuse, and she reported it to the Child Advocacy Center, and G.S. later told her about the sexual abuse a second time. *Id.* p. 171; ECF No. 4-13 p. 5.

Mr. Barber testified at trial. He denied any of the incidents occurred. He denied having intercourse, oral sex, or sexual relations with G.S. *Id*. p. 225. He testified that he was a father figure in the household, the children loved him, and he disciplined them. *Id.* p. 237; ECF No. 4-13 at 5.

## III.    Post-Conviction Hearing

The Court of Special Appeals summarized Mr. Barber's arguments in his Petition for Post-Conviction Relief, stating:

> The only crime of which [Mr. Barber] was convicted that required proof of penetration was second-degree rape.  The flagship allegation made in [Mr. Barber's] petition for post-conviction relief dealt with two criticisms:  (1) that defense never consulted with an OBGYN or a child sexual abuse specialist; and (2) no defense expert was called to refute the opinion of Dr. Wehberg that a normal genital exam can be consistent with penetrating sexual abuse.

ECF No. 4-13 p. 9.  The court explained that penetration is a necessary element of the crime of second-degree rape under Maryland law, citing *Kackley v. State*, 63 Md. App. 532 (1985) (citations omitted).  "Penetration, however slight, will sustain a conviction . . . but the proof thereof must sustain a *res in re*, that is, an actual entrance of the sexual organ of the male within the labia (majora) of the pudendum (the external folds of the vulva) of the female organ, and nothing less will suffice."  *Craig v. State*, 214 Md. 546, 136 A.2d 243 (1957) citing 1 Wharton, *Criminal Law* (l2th ed.), § 697.  "Penetration into either the labia minoria or the vagina is not required; invasion of the labia majora, however slight is sufficient to establish penetration."  *Craig*, 214 Md at 546. ECF No. 4-13 pp.  9-10.[3]  The Court of Special Appeals then examined the testimony presented at trial.

### A.     Testimony of Theodore Hariton, M.D.

Dr. Theodore Hariton, a board-certified obstetrician and gynecologist from Arizona called by Mr. Barber as a witness, testified that he had reviewed Dr. Wehberg's trial testimony, Heather Sullivan's deposition and trial testimony, and G.S.'s trial testimony.  On direct examination, Dr, Hariton testified:

> Q. And after you reviewed it did you arrive at any conclusions regarding whether the medical evidence was consistent with penetration?
>
> A.  I did.

---

[3]     On the issue of penetration, the jury at Mr. Barber's trial was instructed, that "[v]aginal intercourse means the penetration of a penis into the vagina.  The slightest penetration is sufficient, and the emission of semen is not required."  ECF No. 4-3 p. 13.

Q.  And what were those conclusions?

A. With reasonable medical certainty there's no medical evidence that penal [sic] vaginal penetration occurred at that time.

Q. Okay. So it would be unusual for a six-year old or a very young girl to have no finding after an episode of nonconsensual penal [sic] vaginal penetration?

A. Yes, it would.

Q. And what would you expect the history and physical findings to be that would be consistent with vaginal penetration?

A. Well, two things.  First of all, the history, you should have pain and bleeding.  If you go inside a hymen and tear a hymen in a little girl it will bleed and cause pain.  The second thing is it will heal, all of them heal very nicely but it will heal with some physical change in shape that will tell you something happened in this period of time.

Q.  And are both these findings important?

A. Yes.

Q. And why so?

A Well, the history of bleeding, pain, and bleeding is one of the most consistent things in all the literature.

Q. Okay.

A. When you go through the findings you have the history of pain and bleeding.

Q.  And were these present in this case?

A.  No, there was no evidence-I'm sorry, there was nothing in this record that I found.

Q. What would be the diameter of a vaginal opening in a girl this age?

A.  Hymenal opening in a girl in this age would be six or seven millimeters, like half the size of your little finger.

Q.  And what's the average diameter of an erect male penis?

A.  35  to 39 millimeters.

Q.  It's about an inch and a half?

A.  About an inch and a half, yeah.

Q.  Okay, so it's maybe an inch and a half trying to get into a quarter inch roughly?

A.  Roughly.

Q.  Now is the hymen stretchable or would it tear if it were penetrated?

A.  It is not stretchable.  When you examine a little girl, frequently you'll have to examine and get a specimen with a Q-tip.  And if you touch the hymen with your Q-tip, the kid jumps.  It is very delicate and very thin.

**********

Q. Okay.  Now what would a normal six-year old vaginal area look like?

A.  Well, the labia majora would be flat, the labia minora is very thin.  The whole area is pinkish.  It's a little redder than an adult because the tissue, the vessels are so close to the skin.  It's very thin, two to three cells thick, it's not stretchable, it's very easy, it not distensible because there is no rigi[dity][4,] it won't stretch.  It's really vulnerable to any trauma or infection.

**********

Q. So what kind of medical evidence could be found after forceful penal [sic] vaginal penetration of a girl around six years old?

A.  What you should see is depending if it's a complete laceration or not-

Q.  Could you speak a little bit slower?

A.  Okay, I'm sorry. It depends on the depth of the penetration, how far it went.  It doesn't fit so therefore it can't go very far.  But it can tear.  If it's a transection, which means it goes all the way through the hymen down to the vagina, then you'll see that the hymen is a circle like this, and would be a totally completed circle.  If you tear, do a transection, it means you cut all the way through here, this would be the vagina, and when they heal it will still heal like this but it will heal with a section, there won't be any hymen here at all.

---

4    Alteration added.

And if not totally sometimes you just have a very deep notch right in that area that's easy to see.  It will all heal so it will be smooth, but it will be a change.

Q. So there would be some kind of-

A.  Physical evidence, yes.

Q.  There would be some kind of result, some kind of evidence left-

A. Yes.

Q.  – if this happened, okay is there anything in the reports that you read that suggests that there was actual penal [sic] vaginal penetration

A. No.

ECF No. 4-6 pp. 20-26; ECF No. 4-13 pp. 10-13.   Additionally, Dr. Hariton expressed his disagreement with aspects of Dr. Wehberg's testimony.

First and most important, she said that the hymen of a little girl is very vascular and elastic.  It is not elastic, it's not stretchable at all, and it's not vascular.  It looks a little pinker than the rest of the tissue because it's so thin blood, the vessels that are there are closer to the surface.  But it's not stretchable.

ECF No. 4-6 p. 26; ECF No. 4-13 p. 14.

Dr. Hariton disagreed with Dr. Wehberg's testimony.  He disagreed that medical literature states there can be "penal [sic] vaginal penetration in a prepubertal girl without any physical findings" and cited to several publications in support of his position.  ECF No. 4-6 p. 27-31; ECF No. 4-13 p. 14.  Asked whether he was "comfortable in saying there's no medical evidence of vaginal penal [sic] penetration" of G.S., Dr. Hariton responded that he saw no evidence of "penal [sic] vaginal penetration."  ECF No. 4-6 p. 31.

On cross examination, Dr. Hariton testified that there should be scarring if there is injury to the hymen in a prepubertal girl.  The amount of scarring will be different depending on the age, estrogen, and amount of damage to the girl.  ECF No. 4-6 p. 41; ECF No. 4-13 pp. 15-16.

A.  So if there is superficial injury to the hymen will a physician be able to see scarring?

Q.  It may or may not form a notch, a superficial notch.  But a penis can't get in a little -- a 39 millimeter penis can't get into a six millimeter hymen with a superficial injury.

A.  And I will go ahead and inform you penetration is defined in the state of Maryland as entrance into the labia minor.

Q.  Okay.

A.  So while I appreciate your definition that it's you know, penile penetration in the vagina, that is not what's legally required in the State of Maryland.

A  That's but to a juror I think penetration means penetration.  The word penetration means to enter.  It means to enter.

Q.  It means however slight in the State of Maryland, Dr. Hariton.

A.  Okay.

Q.  So it does not require piercing, puncture or any injury to the hymen, just so that you're clear.

A. Okay.

**************

Q.  [What is] [t]he primary way that physicians diagnose sexual abuse?

A.  By the history and by the examination.

Q.  By patient history [?]

A.  Patient history and examination.

Q.  The timing of the examination, is that crucial to determining whether there was penetration?

A.  If you examine a child at the acute phase of contact you'll see a different set of findings, just penile contact or touching you'll have bruising, a little staining, a little bit of this, and it heals very quickly.  But actual penetration by this time it's healed.  There's a short period of time it takes to heal the small stuff.

Q.  So things heal very quickly in the hymen or the vaginal area correct?

A.  Reasonably quickly.  Again depending on the child and the injury.

************

Q.  … Did you view the photographs Dr. Wehberg took in this case?

A.  No, I never got the photographs.

Q.  She testified that there was no evidence of acute trauma and not evidence of scarring.

A.  Yes, I saw that.

Q.  And you're aware that she [Dr. Wehberg] testified on cross-examination that she could not confirm or deny that abuse had happened in this case?

A.  That is correct.

Q.  Is that accurate, would that be an accurate statement?

A.  Without any findings you can't confirm or deny? ... I said without any findings you can neither confirm nor deny that there was sexual activity.  In this case you can deny penile vaginal penetration but you couldn't deny sexual contact.

Q.  And penile vaginal you mean penis through the hymen?

A.  No.

Q. You don't mean penis through the labia majora or labia minora?

A.  I do not.

ECF No. 4-6 pp. 41-44

************

18

Q.  Dr. Hariton, when you testified on direct that to a reasonable degree of medical certainty there was no evidence of penetration based on what you reviewed in this case, you meant penetration to the hymen?

A.  I meant physical penetration of the penis into the vagina.

Q.  Into the vagina, and to the get to the vagina the penis would have to-

A.  Go through the hymen.

Q,  Go through the hymen. Okay.  Just so we're clear.

ECF No. 4-6 pp. 46-47

************

A.  … If you would, the text book that you so kindly brought Evidence of Evaluation of the Sexually Abused Child would you turn to page 120, please?

************

And captioner under sexual abuse delayed disclosure.

************

That paragraph discusses findings in chronic, in cases of chronic sexual abuse, is that correct?

A. The first edition, this chapter was called sexual abuse chronic changes. This edition she's changed that to sexual abuse delayed disclosure.  So the two books, the chronic changes, that's why she says what we term chronic changes in the previous edition

Q.  If you will read for the Court that paragraph.

A. What we termed chronic conditions in the previous edition was better described as medical findings associated with healed genital trauma.  Since most children delay disclosure, medical professionals are typically asked to evaluate a child long after injuries should have healed.  However, as noted previously, where there has been significant trauma associated with vaginal penetration, healed disruptions of the posterior fourchette, vestibular mucosa, hymen, and anus may be found.

Q.  May be found.

19

A.  Yes.

Q.  So a normal genital exam can be consistent with penetrating vaginal abuse, is that correct?

A. I've never seen that written.  It would depend on how much penetration we're talking about.  We're talking about the child.  The amount of penetration, how the child heals.

Q.  Is it possible, is my question?

A.  I don't know, I've never seen it, never seen it written.

Q.  Based on your experience and your review of the literature, it can be consistent?

A.  It's a very hard question because I've never seen it, never seen it happen, and the tendency in medicine is to always say never say never.

ECF No. 4-6 p. 51-53, ECF No. 4-13 pp. 15-19.

### B.    Testimony of Trial Counsel

Mr. Barber's trial counsel, Archibald G.W. McFadden, testified to having 17 years of trial experience, familiarity with the literature on sexual abuse of young girls, and significant experience handling child abuse cases for the Public Defender's Office in Wicomico County.  ECF No. 4-6 pp. 16-15; ECF No. 4-13 pp. 20-21, 58-59, 61.

On direct examination, Mr. McFadden testified that he did not consider consulting with a child abuse specialist expert in this case.  ECF No. 4-6 pp. 61; ECF No. 4-13 p. 20.  He told the post-conviction court that he reviewed Dr. Wehberg's report finding that G.S.'s hymen was normal and that sexual abuse could neither be diagnosed nor excluded, and "was satisfied with the results" of the report.  ECF No. 4-6 p. 61.  Trial counsel testified that his theory of the case was that the State could not prove beyond a reasonable doubt that G.S. was sexually abused.  ECF No. 4-6 p. 62; ECF No. 4-13 pp. 19-20.

On cross examination by the State and later on redirect, he testified:

Q.  Why didn't you consider consulting with an expert in Mr. Barber's case?

A.  Personally, I didn't think I needed to.

Q.  Why?

A. There were all the elements in place in this case, in my opinion, we should have won.  And Dr. Wehberg's opinion I was generally satisfied with.

*************

Q.  You said you had a hard time winning these in front of juries.  In your experience what's the deciding factor for a jury in a case where there's no physical evidence?

A.  I would say I don't think there's one - personally I don't believe that there's one deciding factor.  I think if what is in place is a reason for the victim to fabricate or make it up, there's a lack of physical evidence, there's an articulate criminal defendant who can testify, all of those factors are significant.  And if you have, as I did in this case, I had all of those factors, I think they all play together.

*************

Q. Knowing what you know now would you do anything different in this case?

*************

A. Would I do anything different?  I, in reviewing the documentation, I would have cross-examined the victim differently.  I probably would have been more aggressive.  And I hope I that I would have won.

Q.  Did you treat Mr. Barber's case different than any other in which you have defended individuals in the last 17 years?

A.  No. Mr. Barber's case was a serious case and I actually like Mr. Barber very much as an individual.  So no, I did not treat it differently than I would treat any other serious case.

ECF No. 4-6 pp. 65-66; ECF No. 4-13 pp. 22-23.

### III.    Analysis

The Sixth Amendment to the United States Constitution affords a criminal defendant the right to "Assistance of Counsel."  U.S. Const. amend. VI.  The Supreme Court has stated that "assistance which is ineffective in preserving fairness [of a trial] does not meet the constitutional mandate."  *Mickens v. Taylor*, 535 U.S. 162, 166 (2002).  In *Strickland v. Washington*, 466 U.S. 668 (1984), the Court explained that to show constitutionally ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice—that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," *id*. at 687, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

To satisfy the deficient performance prong of the *Strickland* standard, a defendant must show "that counsel's representation fell below an objective standard of reasonableness."  *Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986).  "Judicial scrutiny of counsel's performance must be highly deferential" and not based on hindsight.  *Strickland*, 466 U.S. at 689.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id*.  A petitioner "... must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Id*.  Decisions made by counsel may be subject to second-guessing with the benefit of hindsight; however, counsel's tactical and strategic choices made after due consideration do not constitute ineffective assistance of counsel, and there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance.  *Id.*

Under the Sixth Amendment, a defendant "has a right to effective representation, not a right to an attorney who performs his duties 'mistake-free.'" *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006)).

To satisfy the prejudice prong of the *Strickland* standard, a petitioner must show "that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman*, 477 U.S. at 375. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman*, 477 U.S. at 374. A determination whether the attorney's performance was deficient need not be made if it is clear that there was no prejudice. *See Strickland*, 466 U.S. at 697.

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### A.      Failure to Investigate the State's Medical Expert Claim

On post-conviction review Mr. Barber argued that expert testimony countering Dr. Wehberg's opinion would have helped to present a valid defense to the rape charge, and also bolster counsel's attack on G.S.'s credibility as to whether any abuse occurred at all. He argued that his trial counsel was deficient because, had he consulted with a medical expert, he would have found a basis to challenge Dr. Wehberg's testimony as inconsistent with G.S.'s allegations. Specifically, an expert like Dr. Hariton could have disputed Dr. Wehberg's testimony that a little girl's hymen

is very vascular and elastic, as well as her claim that medical literature supported her testimony that penile vaginal penetration in a prepubertal girl can occur without any physical findings.  Mr. Barber further argued that counsel's strategy was unreasonable because further investigation and efforts to counter Dr. Wehberg's conclusions would not have detracted from the stated trial strategy.  ECF No. 4-13 p. 27.

The State countered that trial counsel's strategy not to consult an expert was part of a legitimate trial strategy, and Mr. Barber failed to prove the strategy was uninformed or unreasonable. No. 4-13 pp. 26-27.

Applying the *Strickland* standard, the Court of Special Appeals examined trial counsel's performance, taking note of his experience defending sexual abuse cases, his review of Dr. Wehberg's report, and his decision to defend Mr. Barber by impeaching G.S. to demonstrate her lack of credibility to convince the jury the State had failed to prove Mr. Barber's guilt beyond a reasonable doubt.  The Court of Special Appeals rejected Mr. Barber's contention that had trial counsel consulted a medical expert like Dr. Hariton, or relevant medical literature, trial counsel could have found information that a prepubertal girl could not have a normal genital exam after penetration, stating that "[c]ontrary to Dr. Hariton's testimony, there was ample medical literature from very reputable peer reviewed medical journals that supported Dr. Wehberg's opinion."  ECF 4-13 pp. 35-36 (citations to medical journals omitted).  The court stated:

> A competent criminal defense lawyer representing a defendant in a case like this one, should, upon receipt of a report by a medical expert like Dr. Wehberg, consult an independent expert under some, but not all, circumstances.  One of the circumstances where an expert should be consulted would be if the lawyer is unfamiliar with the medical literature concerning the issue about which the State's expert is prepared to testify.  In this case, trial counsel testified that he was presently familiar with the relevant medical literature.  But trial counsel was never asked about what he did know.  Except for trial counsel's testimony, there was no other direct or circumstantial evidence on this subject.  Because appellant failed to show that at the time of his 2010 trial his counsel was unfamiliar with the pertinent

literature, the State was entitled to the benefit of the presumption that trial counsel's performance (in so far as it covered medical research) was professional and competent. *State v. Peterson*, 158 Md. App. 55g (2004).

ECF No. 4-13 pp. 37-38. Turning to the related issue of what trial counsel should have known in 2010, had he consulted the relevant literature, the court stated:

> There is nothing in the record to show that what Dr. Wehberg said about the vaginal area was in error. So no matter how much research [Mr. Barber's] trial counsel had done, the State's expert could not have been effectively cross-examined on that point. Appellant takes a contrary view, which is based on Dr. Hariton's testimony. Dr. Hariton said that Dr. Wehberg was wrong when she said that "the hymen of a little girl is very vascular and elastic." But, contrary to what Dr. Hariton testified to, Dr. Wehberg never testified that the hymen is "very vascular" and "elastic." She testified that the "vaginal area is very vascular and very elastic and can heal very rapidly." As the State points out, appellant's argument is like comparing apples to oranges.

*Id*. pp. 38-39.

In regard to Mr. Barber's contention that trial counsel should have consulted with and called a witness who would have testified as Dr. Hariton did at the post-conviction hearing, the court concluded:

> In our view, G.S.'s testimony did not make it clear that there was "forceful penetration" through the hymen. *See Adams*, supra, at 32L ("Young children have no concept of what is meant by the term in the vagina. A statement such as 'he put his thing in my privates may or may not mean that full penetration occurred.'"). If there had been forceful penetration into the vagina, as both Dr. Hariton and Dr. Wehberg agree, there would have been bleeding - and G.S. did not report bleeding. As already pointed out, to prove second-degree rape in Maryland, proof of penetration through the hymen is not necessary. And, even Dr. Hariton does not contend that two years after the event that there would be signs of trauma, if the hymen is not ruptured. Under such circumstances, it is far from clear what would have been gained if [Mr. Barber's] counsel had found a doctor who would have contradicted Dr. Wehberg and said that if there is penetration of the hymen there will be evidence of that penetration in a post-rape examination.

*Id*. p. 39-40.

Trial counsel testified that in his analysis Mr. Barber's case involved all three factors necessary successfully to defend a child abuse case: (1) a reason for the victim to fabricate; (2)

lack of physical evidence to support the victim's allegations; and (3) an articulate criminal defendant who can testify.  His strategy was to focus on G.S.'s lack of candor.  The court determined that trial counsel set forth a reasonable basis for his trial strategy.

> It would not, of course, be considered sound trial strategy to not consult with a physician if something said in Dr. Wehberg's report was manifestly in error or that she held an opinion that a reasonably competent lawyer, familiar with the relevant literature, should have recognized as invalid.  As shown, it is far from clear that any opinion Dr. Wehberg gave was in error.  At the time of trial (and presently) some, but not all, experts in her field agreed with Dr. Wehberg that a normal physical exam does not exclude the possibility of past penile penetration of the hymen.  Because of a significant number of journal articles supporting Dr. Wehberg's views, calling an OBGYN who shared Dr. Hariton's opinions would be risky inasmuch as such opinion could be contradicted, or at least undermined by the literature discussed, *supra*.

*Id*. p. 41.

Applying the *Strickland* standard, the court observed that when counsel's decision is based upon partial investigation, the resulting tactical decision remains presumptively reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 691.  In other words, representation is not ineffective if based on a reasonable investigation or "a reasonable decision that makes particular investigations unnecessary." *Id*.  Even a decision not to investigate is entitled to "a heavy measure of deference to counsel's judgment." *Id*.  By focusing his efforts on establishing reasonable doubt, trial counsel did not provide ineffective assistance, even if the trial strategy did not result in a successful outcome for his client.  Thus, the court concluded Mr. Barber had failed to demonstrate that counsel's representation fell below an objective standard of reasonableness to meet the performance prong of the *Strickland* test.  Having concluded that Mr. Barber failed to meet the performance prong of the *Strickland* standard, the Court of Special Appeals determined it unnecessary to consider the prejudice prong.  ECF No. 4-13 pp. 40-43.

The court reached its conclusion after properly stating the *Strickland* standard, and the court's application of that standard to the facts of the case was reasonable. Having examined the state court's ruling as well as having independently examined the record, this court is satisfied that in applying the *Strickland* standard to Mr. Barber's allegations, the state court reasonably concluded that counsel made a strategic decision not to consult other witnesses, which a court will not second guess. *Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991) (challenge to counsel's trial decisions and tactics amounted to no more than "Monday morning quarter backing"). The state court's ruling survives scrutiny under the standards announced in *Strickland* and set forth at § 2254(d). Accordingly, this claim for relief will be denied.

### B.    Failure to Object to Admission of Inaccurate Evidence Claim

Mr. Barber next claims that counsel was ineffective for failing to object to the admission of inaccurate and misleading scientific evidence that violated his right to due process. Mr. Barber claimed that Dr. Wehberg's testimony was misleading "because it was based on her misunderstanding of the generally accepted methodology for diagnosis of anatomical findings in relation to prior sexual acts," and its admission violated his right to due process. ECF No. 4-5 p. 25; *see also* ECF No. 4-7 at 10.

In rejecting this claim, the post-conviction court determined that this evidence was not inaccurate or misleading, and found the case law on which Mr. Barber premised his due process claim involved convictions based on "patently incorrect numerical data." ECF No. 4-7 p. 10. In contrast, Dr. Wehberg was a properly qualified expert with sufficient factual basis to support her expert medical opinion.

> The Petitioner's disagreement with Dr. Wehberg's testimony, and the claim that contrary expert testimony could have refuted it, quite simply, does not make Dr. Wehberg's testimony inadmissible, or establish that it does not conform to generally accepted scientific norms. As discussed above, Dr. Hariton's

27

testimony at the Post-Conviction hearing, at most, merely cast doubt on Dr. Wehberg's testimony and certainly did not provide a basis to render that testimony inadmissible. Further, Mr. McFadden reasonably concluded that he could rely on Dr. Wehberg's inconclusive finding regarding abuse to argue that reasonable doubt existed. Thus, he had no reason to object to the testimony, as he could rely on her opinion in arguing for an acquittal.

*Id.*

In the absence of a reason to object to the testimony, trial counsel was not ineffective for failing to object. The state court found counsel's trial strategy was reasonable and his decision not to raise an objection was consistent with this strategy. Mr. Barber does not meet his burden to show the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This claim provides no grounds for habeas relief.

### C.   Ineffective Assistance for Failing to Object to Prior Inconsistent Statements

Mr. Barber's third claim for federal habeas relief is that trial counsel was ineffective for failing to request a limiting instruction that prior inconsistent statements offered by Dr. Wehberg, Ms. Sullivan, the social worker, and Tahesha Barber, the victim's mother, were not intended for the truth that the abuse actually occurred. Additionally, he faults trial counsel for failing to object to G.S.'s testimony that she told her mother and sister about the abuse. The Circuit Court denied this claim for lack of merit because G.S's statements to Dr. Wehberg and Ms. Sullivan were admissible for the truth of the matter asserted under Md. Code Ann., Crim. Pro. § 11-304. The State Court noted that the evidence was properly admitted under the evidentiary laws of Maryland, and thus trial counsel could not be ineffective for failing to object.

Trial counsel does not provide ineffective assistance by failing to raise a meritless objection. *Oken v. Corcoran,* 220 F.3d 259, 269 (4th Cir. 2000) ("[T]rial counsel was not

28

constitutionally ineffective in failing to object ... because it would have been futile for counsel to have done so."); *Truesdale v. Moore,* 142 F.3d 749, 756 (4th Cir. 1998) ("It is certainly reasonable for counsel not to raise unmeritorious claims".).  Further, because these objections would have been denied had they been made, Mr. Barber cannot show a reasonable probability of a different outcome to satisfy the prejudice prong of *Strickland*.

Turning to trial counsel's decision not to object to Tahesha Barber's testimony about G.S.'s statements, the post-conviction court found counsel's action consistent with his stated trial strategy.  " …[G.S.'s] allegations were largely unsubstantiated and there was no physical evidence to corroborate her story.  Ms. Barber's testimony as well as [G.S.'s] testimony left Mr. McFadden ample room to argue reasonable doubt," therefore, the court concluded that trial counsel's "decision whether or not to object … was within, his sound discretion."  ECF No. 4-7 p. 12.  The post-conviction court's conclusion that the failure to object to statements made to Ms. Barber was part of a reasonable trial strategy given the circumstances and substance of those statements is entitled to deference under § 2254(f) and *Strickland*.  Accordingly, federal habeas relief is denied as to this claim.

### D.  Failing to Object to Witness Comments Claim

Mr. Barber's fourth claim is that trial counsel was constitutionally deficient for failing to object to comments made during the State's opening statement and to request a limiting instruction. The State's opening statement began:

> [G.S.] will testify today.  I expect that she will tell you what she was eventually able to tell Child Protective Service worker Heather Sullivan that her stepfather, the defendant seated before you today, began to abuse her at age 5 and it continued for years.
>
> I say eventually because [G.S.] initially made a disclosure and was questioned in May and July of 2009.  She was questioned at the Child Advocacy Center by

Heather Sullivan, Child Protective Service Worker, and then once an exam, a medical exam was completed by Dr. Jennifer Wehberg.

[G.S.] told Sullivan and Wehberg about one event of sexual abuse. She didn't tell everything.

But that's not unusual, ladies and gentlemen.  You will hear today from Catherine Beers who is a licensed clinical social worker.  She is an expert in the field of Social Work and Child Sexual Abuse.

\*\*\*\*\*\*\*\*\*\*

Keep in mind, she was five when the abuse began, five years old, or was it that she didn't feel supported by her mother, that her mother didn't want to believe her, didn't want to believe the person that she married and loved could commit such horrific acts upon her child?

I expect you will hear that [G.S.]'s mother, Tahesha Barber, even after [G.S.]'s initial disclosure in May and July of 2009 that Tahesha continued to see the defendant. ... Keep in mind that she is 12 years old and she was 5 when the abuse began.  I make no promises as to exactly what she will be able to tell you today.

\*\*\*\*\*\*\*\*\*\*

You will also, in addition to hearing from G.S. hear from Heather Sullivan, the social worker in this case.  You will hear from Dr. Wehberg, and you will hear from Cathy Beers ...

ECF No. 4-5 p. 29.  The Circuit Court in its Statement of Reasons found no merit to Mr. Barber's claims regarding the State's opening statement.

The Petitioner alleges that the Assistant State's Attorney, in her opening statement, ". . . effectively - and prejudicially - set the stage to rehabilitate [the victim's] vague allegations."  Petition, 21.  The Petitioner cites Maryland Rule 5-616(c)(2), which indicates that there are three prerequisites to the admission of a prior statement as rehabilitation:  (1) the witness' credibility must have been attacked; (2) the prior statement is consistent with the trial testimony; and (3) the prior statement detracts from the impeachment.  According to the Petitioner, these prerequisites were not satisfied.  After careful review of the transcript and consideration of the arguments, the Court finds that the State's remarks in opening

statement were not improper, and thus Mr. McFadden's failure to object is not ineffective assistance of counsel.

> At the outset, the Court notes that the Petitioner has mischaracterized the prosecutor's statements as rehabilitative.  The challenged remarks were that "she [the victim] didn't tell [Sullivan and Wehberg] everything" and "I make no promises as to exactly what she [the victim] will be able to tell you today."  In making these remarks, the Assistant State's Attorney merely outlined what she expected the jury to hear that day, which embodies the very purpose of opening statements.  *See White v. State,* 11 Md. App. 423, 274 A.2d 671 (1971) (noting that opening statements are to advise the jury as to what it may expect by way of evidence and questions which will be presented to it).

ECF No. 4-7 p. 13.

The court also rejected Mr. Barber's claim that trial counsel was deficient for failing to challenge the admissibility of prior out of court statements, for reasons already discussed in regard to Md. Code Ann., Crim. Pro. § 11-304. *supra*.  Lastly, the court found Mr. Barber's claim that trial counsel was ineffective by failing to object and preserve the issue for appeal had no merit.  Because the evidence and testimony were admissible, counsel was not ineffective for failing to object where there was no legal basis to a grant relief.  ECF No. 4-7 p. 13.

As already discussed, trial counsel does not provide ineffective assistance by failing to object to admissible evidence and testimony.  The state court ruling was neither contrary to, nor involved an unreasonable application of applicable Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  The state court decision is based on facts well-supported in the record and premised on a reasonable application of *Strickland* to those facts.

### E.    Failure to Object to Witness' Comment Claim

As to his fifth claim, Mr. Barber contends that trial counsel rendered ineffective assistance by failing to object to Tashesa Barber's comments on the truthfulness of the victim.  When

questioned at trial regarding what she said when G.S. told her of the sexual abuse, Ms. Barber answered:

> Word for word, I don't remember exactly what I told [G.S.]. I know that I was confident to [G.S.] when she told me. I had gotten a little bit confused when you said May as to which time it was that she had said it. She disclosed information to me twice. May was the first time that she told me. And the first time that she told me, I was just, you know, I was confused, you know. She had just told me that, you know, my husband had touched her, and I didn't want to believe it the first time she told me, you know. But at the same time that's my child so I was confident to [G.S.] and confused at the same time which was the reason why I reported it to the child advocacy center because I didn't know what to do.

ECF No. 4-2 p. 171; ECF No. 4-7 p. 14.

The court found that Ms. Barber's statements did not "constitute clear vouching" for G.S.'s truthfulness. ECF No 4-7 p. 15. Although the "plain meaning" of the comment that Ms. Barber "was confident to [G.S.] is not completely discernible," the court continued that "if a reasonable inference can be drawn that Ms. Barber was commenting on [G.S.'s] truthfulness," trial counsel's failure to object was not ineffective assistance. The court concluded that an objection would not likely have affected the outcome of trial." *Id.*

Mr. Barber next claimed that the prosecutor erred during closing argument by reemphasizing the victim's credibility when she said: "Mother never doubted [the victim's] credibility. She didn't want to believe her, but she never doubted that [the victim] was telling the truth. Tr. 9/2/10, 35." *Id.* The court found no error in admitting these statements as prosecutors are generally granted "liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom." *Spain v. State*, 386 Md. 145, 152-3 (2005) (quoting *Degren v. State*, 352 Md. 400, 429-30 (1999)). Further, "[a]lthough courts have disapproved of the prosecutor 'vouching' for the credibility of a witness, courts have emphasized" that evaluating witness credibility "is often a transcendent factor in the factfinder's decision

whether to convict or acquit a defendant" and counsel is permitted to "comment on or attack witness credibility by examining motive not to tell the truth." *Id*. at 154. The Circuit Court found the prosecutor was not vouching for witness credibility, but merely commenting on the fact that G.S.'s mother believed her daughter. The mother's testimony was in evidence, and therefore, properly the subject of closing argument for both the State and the defense. For these reasons, the court determined there was no error in admitting Ms. Barber's statements or in the prosecution's reference to them in closing argument, and trial counsel did not provide ineffective assistance by failing to raise an objection. ECF No. 4-7 pp. 15-16.

As discussed *supra*, trial counsel's failure to raise an objection that is without merit does not constitute deficient performance. The post-conviction court's decision is not "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor is it "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This claim provides no cause to award federal habeas relief and will be denied.

### F. Failure to Object to Expert Testimony about Delayed Reporting Claim

Mr**.** Barber's sixth claim is that trial counsel was deficient for failing to object to testimony by social worker Catherine Beers about delayed disclosure of sexual abuse. Mr. Barber posits that counsel should have objected to Ms. Beers' explanations concerning why G.S. delayed reporting sexual abuse, child abuse accommodation syndrome, and her conclusive statement supporting G.S.'s credibility. ECF No. 1 p. 6; ECF No. 4-5 pp. 16-17.

Mr. Barber argued in his post-conviction petition that Ms. Beers had not met anyone in the family and had not read any reports about the case. Her testimony was based on her expertise in the subject matter and sitting through the trial, and was accepted without objection by trial counsel

33

even though G.S. "had already given a common sense reason that she did not disclose the alleged abuse earlier; 'I was scared.'  ECF No. 4-5 pp. 16-17.

The Circuit Court concluded trial counsel's determination not to object to Ms. Beers' testimony did not constitute ineffective assistance.  Ms. Beers was accepted by the court as an expert in clinical social work and child abuse (ECF No. 4-2, pp. 186-189), and her statements were admissible as expert testimony under Md. Rule 5-702, which permits admission of expert testimony in the form of an opinion or otherwise, if the testimony will assist the trier of fact to understand evidence or a fact at issue.  The Circuit Court further noted that a trial counsel's failure to object "generally indicates that defense counsel felt that the trial error was not critical to his client's case; presumably, therefore, the error did not render the trial fundamentally unfair." *Engle v. Isaac*, 456 U.S. 107, 137 (1982), "The decision to interpose objections during trial is one of tactics and trial strategy." *Oken v State*, 343 Md. 256, 295 (1996).  "The Court cannot find that [trial counsel's] decision not to object to Ms. Beers' testimony rises to the level of ineffective assistance of counsel."  ECF No. 4-7 pp. 16-17.

This court may not grant habeas relief unless it finds that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1).  Under these circumstances, the court finds no error in the state post-conviction court's determination.  The state post-conviction court's determination is well supported by the record.  The state post-conviction court's findings are presumptively correct and withstand scrutiny pursuant to 28 U.S.C. § 2254(d) and (e).

## CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing § 2254 Cases states that the district court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant" in such cases.  28 U.S.C. § 2253(c)(2).  To obtain a certificate of appealability, a habeas petitioner must make a substantial showing of the denial of a constitutional right.  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017); *Slack v. McDaniel,* 529 U.S. 473, 483–84 (2000).  When a district court rejects constitutional claims on the merits, a petitioner satisfies this standard by demonstrating that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Buck*, 137 S. Ct. at 773.  When a petition is denied on procedural grounds, the petitioner meets this standard by showing that reasonable jurists "would find it debatable whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Mr. Barber's claims are denied and dismissed on both procedural grounds and upon the merits.  Upon review of the record, he has not made the requisite showing to warrant a certificate of appealability as to any of his claims, and the court declines to issue one.  He may request that the United States Court of Appeals for the Fourth Circuit issue such a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003).

## CONCLUSION

For these reasons, the court will, by separate order, deny and dismiss the petition and decline to issue a Certificate of Appealability.

September 2, 2020                                  _____/s/_____

                                                                DEBORAH K. CHASANOW
                                                                United States District Judge

35